UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| DENISE ABBEY, individually, and as special administrator of the ESTATE OF MICAH ABBEY,<br><br>           Plaintiff,<br><br>  v.<br><br>CITY OF RENO; *et al.*,<br><br>           Defendants. | 3:13-cv-0347-LRH-VPC<br><br>ORDER |

Before the court is defendants the City of Reno, Reno Police Department ("RPD"), Officer Keith Pleich ("Officer Pleich"), Officer Daniel Bond ("Officer Bond"), and Officer Scott Rasmussen's ("Officer Rasmussen") (collectively "defendants") motion for summary judgment based on qualified immunity. Doc. #71.[1] Plaintiff Denise Abbey ("Abbey"), as the special administrator of the Estate of Micah Abbey, filed an opposition to the motion (Doc. #75) to which defendants replied (Doc. #82).

Also before the court is plaintiff Abbey's cross-motion for summary judgment. Doc. #72. Defendants filed an opposition to the motion (Doc. #77) to which Abbey replied (Doc. #80).

///

---

[1] Refers to the court's docket number.

## I. Facts and Procedural History

This action involves the death of Micah Abbey ("Micah") at a Project Uplift group home[2] during an altercation with RPD officers.

Micah became a resident of the group home on October 12, 2011. Prior to entering the home, Micah had a history of mental illness and had been diagnosed with depression, anxiety, and post traumatic stress disorder. Micah also had a history of drug abuse and was recovering from both a methamphetamine and a marijuana addiction. Despite his recovery, Micah was still occasionally using a form of synthetic marijuana known as "Spice." Micah entered Project Uplift in order to address his mental health and substance abuse issues.

During Micah's short stay at the group home, he was involved in a number of increasingly violent incidents prior to his death. On December 6, 2011, RPD responded to an incident at the group home because Micah was punching holes in the walls and breaking windows in the house. The two officers on scene observed Micah claiming to hear voices, speaking to people that were not in the room, and making statements that the Chinese were invading. Because of his erratic and destructive behavior, Micah was placed in restraints and taken to the hospital. Following the December 6th incident, Micah admitted that he had been smoking "Spice."

Two weeks later on December 17, 2011, the on-duty night shift caretaker observed Micah acting unusual and spending an inordinate amount of time in the bathroom. Two days later, on December 19, 2011, Micah destroyed a clock radio and toppled another resident's dresser, kicking a large hole in the back of it. Then, the very next day, Micah rushed a staff member and began yelling in the staff member's face about a missing fanny pack.

The incident underlying this action began at approximately 1:30 p.m. on December 25, 2011. At that time, Micah was engaged in a telephone call with his brother about his brother's

---

[2] Project Uplift is a rehabilitative mental health organization offering therapeutic mental health services to individuals with various mental health issues. One of the services Project Uplift offers is a supported living arrangement wherein several individuals live together in a group home and share the responsibilities of keeping up the home while at the same time receiving mental health services and support.

recent arrest. During the call, Micah was overhead saying that he would be "going gangsta" on the people responsible for putting his brother in jail. After the call, Micah was visibly agitated and spent the rest of the day pacing and grunting.

At 7:00 p.m. Michael Ross ("Ross"), the on-duty night caretaker, arrived for his shift and gave Micah his nightly medication. Sometime between 7:00 p.m. and 7:45 p.m., Micah started yelling at other residents of the group home because he thought his backpack was missing. Ross intervened and tried to calm Micah by telling him that yelling and getting upset wouldn't help solve the problem. Micah then shoved Ross, held his body against a wall, and began threatening Ross while holding a fork in his outstretched hand.

At 7:45 p.m. Ross called 911 and told the dispatcher that he had been threatened and that he feared for his safety, and the safety of the other residents. While dispatch was on the call with Ross, Micah was overheard yelling in the background "[t]hey're all trying to get me and I'm gonna F'em all up and I'll take care of all of 'em." Micah then punched a hole in the wall, bloodying his hand, and began making loud grunting noises.

At approximately 7:56 p.m. Officer Pleich, a member of RPD's Crisis Intervention Team, arrived at the group home. Officer Pleich spoke briefly with Ross and then went into Micah's bedroom to speak with Micah. For the next ten minutes Officer Pleich spoke with Micah about voluntarily agreeing to go to a hospital to get some help, but he also discussed the possibility of placing Micah on a Legal 2000 hold[3] if Micah was a danger to himself or others. During the conversation, Micah appeared aggravated and made grunting noises.

At 8:06 p.m. Officer Bond arrived and went to assist Officer Pleich. Both officers heard Micah exclaim that he was hearing voices telling him to do things. Micah then punched another hole in his wall. Officer Bond spoke with Ross who wanted to sign a criminal complaint against Micah so that Micah would learn that his behavior had consequences. Micah overheard Ross'

---

[3] A Legal 2000 hold allows a police officer to take someone into custody if the are a threat to themselves of someone else due to their mental state.

1 statement and became increasingly agitated, stating that he would not go willingly and that he
2 would fight the officers if they tried to arrest him. At this point both Officer Pleich and Officer
3 Bond determined that they had reasonable cause to arrest Micah for assault and that it was not safe
4 for Micah or the other residents for Micah to remain at the group home.
5      At approximately 8:11 p.m., while the officers were discussing how they were going to
6 proceed, Micah jumped from his bed towards the officers, told them that he had PTSD, and yelled
7 that they couldn't do "shit" to him. Micah then quickly turned around, climbed his bed, tore the
8 shades from his bedroom window, and attempted to escape by throwing himself through his
9 window. The window cracked, but held, and Micah fell back onto the bed where Officer Pleich and
10 Officer Bond tried to arrest him. Micah ignored the officers' verbal commands to place his hands
11 behind his back and became physically combative, resisting the officers' efforts to place him in
12 handcuffs. The officers were able to get Micah on the ground and place him on his stomach,
13 though Micah kept both arms clenched tightly beneath him. Micah continued to resist arrest and
14 struggle with the officers, preventing them from getting either of his hands behind his back.
15      At 8:14 p.m., Officer Bond attempted to deploy his Taser into Micah's shoulder area.
16 However, with Micah's continued struggling, the probes missed and embedded themselves in the
17 mattress. Officer Bond then twice attempted to drive stun the Taser into Micah's legs, but the Taser
18 failed to make any sound and Micah made no reaction to the stun attempts. Thinking that his Taser
19 was malfunctioning, Officer Bond threw the Taser across the room and moved to assist Officer
20 Pleich with hands-on techniques. Officer Bond was eventually able to pry Micah's right hand far
21 enough behind his back to handcuff it, but Micah pulled his right hand - including the handcuff -
22 back beneath his body. Officer Pleich then continued to try and hold Micah down, Officer Bond
23 used his baton to strike Micah in the shoulder and attempted to pry Micah's right hand from
24 underneath Micah's body, but he was unsuccessful. Officer Pleich then attempted a carotid control
25 ///
26 ///

hold on Micah to get him to release his hands, but the hold was ineffective and Micah continued to fight with the officers.[4]

A minute later, at 8:15 p.m., Officer Bond radioed dispatch requesting additional officers to the scene to help subdue Micah. While Officer Bond was radioing dispatch, Micah grabbed Officer Bond's baton and tried to stand up. Fearing for their safety, both officers wrestled with Micah until Officer Bond was able to throw his baton across the room and out of Micah's reach. Officer Bond then grabbed Officer Pleich's Taser from his belt and deployed the Taser into Micah's back, but once again the Taser made no sound and Micah did not respond to being tased. Believing that this second Taser was also malfunctioning, Officer Bond replaced the Taser cartridge.

At 8:19 p.m., while Officer Pleich was holding Micah on the ground, Officer Bond again radioed dispatch and requested that the next officer to arrive on scene bring RIPP restraints. At 8:20 p.m. Officer Bond used the new Taser cartridge to drive stun Micah's legs. This time the Taser made a noise and Micah's body tensed in response. Micah yelled "I give up" and placed his hands behind his back allowing the officers to handcuff him. However, as soon as he was placed in handcuffs, Micah began to thrash around again, even attempting to stand. Officer Bond moved to sit on Micah's legs to hold them down, but Micah began to buck and kick Officer Bond lifting him off the ground. Officer Bond then attempted to place Micah's legs in a figure four hold, but failed as Micah was actively kicking and struggling.

At approximately 8:21 pm., Officer Brad Demitropoulos of the University of Nevada, Reno Police Department ("Officer Demitropoulos") arrived on scene and tried to help Officer Bond control Micah's legs. While Micah continued to struggle and kick at Officer Demitropoulos, Officer Bond deployed the Taser in drive stun mode into Micah's legs causing Micah to cease resisting for a few seconds. However, as soon as Officer Bond stopped using the Taser, Micah

---

[4] It was later determined that the carotid hold was ineffective because Micah was wearing headphones around his neck. The officers were unable to see the headphones at the time because Micah was wearing a hoodie sweatshirt that covered his neck.

5

immediately started struggling and kicking again. Officer Bond then redeployed the Taser until Micah stopped struggling, only for Micah to begin struggling and kicking again a few seconds later. In total, Officer Bond deployed the Taser a total of 12 times during a two minute period. Eventually Officer Demitropoulos was able to place Micah's legs in a figure four hold preventing Micah from kicking the officers. Officer Bond then stopped using the Taser and went to hold Micah's arms while Officer Pleich held Micah down on the floor. Despite three officers holding Micah, he continued to struggle.

At 8:24 p.m., Officer Rasmussen arrived on scene with RIPP restraints. Officer Rasmussen placed Micah's legs in the restraints and looped the restraints with the handcuffs. The officers then released their hold on Micah. However, shortly after being placed in the RIPP restraints, Micah stopped breathing. Micah was released from the restraints and rolled onto his back. Officer Pleich started chest compressions and REMSA arrived shortly thereafter, but REMSA was unable to resuscitate Micah and he was pronounced dead at 9:00 p.m.

After Micah's death, jars of "Spice" were found in his backpack. Further, at the time of his death Micah tested positive for the presence of "AM-2201" a chemical compound used in the production of "Spice" and banned by the U.S. Food and Drug Administration. Micah's official cause of death was listed as cardiopulmonary arrest complicated by extreme physical exertion associated with agitated delirium.[5] *See* Doc. #71, Exhibit 5, Autopsy of Micah Abbey. Other factors contributing to Micah's death included police restraint procedures, Micah's mental health issues, and multiple drug intoxications including the presence of "Spice" in Micah's system. *Id*.

On June 28, 2013, plaintiff Abbey, the deceased's mother, filed the underlying complaint against defendants for excessive force, negligence, assault and battery, and wrongful death.

---

[5] "Excited (or agitated) delirium is characterized by agitation, aggression, acute distress and sudden death, often in the pre-hospital care setting. It is typically associated with the use of drugs that alter dopamine processing, hyperthermia, and most notable, sometimes the death of the affected person in the custody of law enforcement. Subjects typically die from cardiopulmonary arrest, although the cause is debated." West J. Emerg. Med. 2011; 12(1):77-83.

6

Doc. #1. In response, the moving defendants filed the present motion for summary judgment (Doc. #71) to which plaintiff Abbey filed a cross-motion for summary judgment (Doc. #72).

**II.  Legal Standard**

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.,* 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1141 (C.D.Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252.

Where, as here, parties filed cross-motions for summary judgment on the same claims before the court, the court must consider each party's motion separately and on its own merits. *Fair Hous. Council of Riverside Cnty, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted). Accordingly, "the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and opposition to both motions, before ruling on each of them." *Id*. at 1134.

**III.   Discussion**

It is well established that "[g]overnment officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In contrast to a standard motion for summary judgment, which places the burden on the moving party to point out the lack of any genuine issue of material fact for trial, a motion based on a claim for qualified immunity imposes the burden on the plaintiff to show "both that a constitutional violation occurred and that the constitutional right was clearly established at the time of the alleged violation." *Green v. Post*, 574 f.3d 1294, 1300 (10th Cir. 2009).

In their motion, moving defendants argue that plaintiff Abbey cannot establish that they violated Micah's constitutional rights. Specifically, moving defendants contend that they did not use excessive force in their attempts to restrain Micah on the night of December 25, 2011. As addressed below, the court agrees.

A claim that officers have used excessive force in the course of seizing a person is analyzed under the Fourth Amendment's objective reasonableness standard. *Scott v. Harris*, 550 U.S. 372, 381 (2007) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). The appropriate test is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Hooper v. County of San Diego*, 629 F.3d 1127, 1133 (9th Cir. 2011). To determine if a Fourth Amendment violation has occurred, the

court first assesses the gravity of the intrusion by evaluating the type and amount of force inflicted. *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). The court then balances "the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests" in order "to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances." *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). To complete this balancing analysis, the court must examine several factors including: (1) the severity of the crime at issue; (2) whether the individual posed an immediate threat to the safety of the officers or others; and (3) whether the individual actively resisted arrest." *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 931 (9th Cir. 2001).

Further, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hayes v. County of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013) (internal punctuation and citations omitted). Thus, "all determinations of unreasonable force . . . must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*.

### A. Type and Amount of Force Used

The first part of the court's excessive force analysis is to determine the type and amount of force used by each officer. *See Miller*, 340 F.3d at 964.

**Officer Pleich**

Officer Pleich was the first officer to arrive at the Project Uplift group home on the night of December 25, 2011. When he arrived he first spoke with Ross and then spoke with Micah in his room for approximately ten minutes. He was the only officer on scene during those first ten minutes, but he made no attempt to arrest or physically restrain Micah.

After determining that there was reasonable cause to arrest Micah for assault, and that removing him from the home was in the best interest of safety for Micah and the other residents,

9

Officer Pleich only used "hands-on" techniques to physically control Micah and take him into custody. These hands-on techniques included holding onto Micah's body, attempting to pry Micah's left hand from underneath his body, and attempting to apply a carotid artery hold on Micah's neck. All of the techniques and holds used by Officer Pleich are basic, hands-on, physical holds which are RPD and Nevada Police Officer Standards and Training ("P.O.S.T.") approved.

**Officer Bond**

Officer Bond was the second officer to arrive on the scene and was directly informed that Ross wanted to press charges against Micah for assault. Thus, Officer Bond had reasonable cause to arrest Micah. When he and Officer Pleich moved to arrest Micah, Officer Bond, like Officer Pleich, initially only employed hands-on techniques to physically control Micah. However, after several minutes of struggling with Micah, Officer Bond escalated his use of force to include the use of his baton and a Taser.

Specifically, Officer Bond struck Micah once on the right shoulder with his baton and then tried to use the baton to pry Micah's right hand from underneath his body. When this proved ineffective, Officer Bond escalated to using his Taser in both probe and drive stun mode. Unfortunately, the first use of the Taser proved ineffective. After Micah grabbed his baton, Officer Bond then grabbed Officer Pleich's Taser and deployed it in both probe and drive stun mode which proved equally ineffective. It was not until Officer Bond changed the Taser cartridge that the Taser was finally functional. Officer Bond then used the Taser in drive stun mode for a total of 12 times in a two minute period.

**Officer Rasmussen**

Officer Rasmussen was the last officer to arrive on scene and was the only officer to carry RIPP restraints. His sole use of force, in the less than one minute that he engaged with Micah, was to place Micah's legs in the RIPP restraints and connect them to the handcuffs.

///

///

### B. Reasonableness of Force Used

After determining the type and amount of force used, the court must then determine the reasonableness of the officers' force when viewed under the totality of the circumstances. *Espinosa*, 598 F.3d at 537. Here, the court finds that the officers' use of force to restrain and arrest Micah was not excessive. First, upon arriving at the group home, Officer Pleich and Officer Bond were confronted with an individual who had physically threatened other residents of the home. Further, Ross specifically told the officers that he desired to press charges against Micah so that Micah would learn the consequences of his behavior. As such, the officers had reasonable cause to arrest Micah for assault when they entered his room.

Second, the officers were presented with a serious safety issue when they confronted Micah. Micah was claiming to hear voices and was being physically destructive. He had already punched holes in his bedroom wall causing himself physical injury. Further, he had threatened other individuals living in the house with a fork. Thus, Micah was a danger to himself and the other individuals living at the group home which supported the officers' decision to restrain him.

Third, Micah actively resisted the officers' attempts to arrest and restrain him. When the officers entered his room, Micah attempted to flee and escape through the window. When his escape was unsuccessful, Micah fought with the officers and refused their verbal commands for approximately 15 minutes before he was finally restrained. During that time he continuously struggled with the officers, kept pulling his hands beneath him, and tried to buck the officers off of him so that he could try and stand. At one point, Micah grabbed Officer Bond's baton, putting both officers' safety in concern. Finally, after allowing his hands to be handcuffed behind his back he continued to struggle with the officers, flailing his legs about. Despite being tased a total of 12 times, Micah continued to resist until Officer Demitropoulos was able to place his legs in a control hold.

Based on the above circumstances, the court finds that the officers' use of force was objectively reasonable. Specifically, Officer Pleich and Officer Bond's use of hands-on force to

physically control Micah, an individual who had attempted to escape and was actively resisting for over 15 minutes, was objectively reasonable under the totality of the circumstances. *See e.g., Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1096-1097 (9th Cir. 2006) (holding that the use of hands-on control holds was objectively reasonable when the suspect was resisting arrest and refused to obey officer commands). Similarly, the court finds that Officer Rasmussen's limited conduct of placing the RIPP restraints on Micah when the restraints were specifically requested by Officer Bond was also objectively reasonable. Especially in light of Micah's continued resistance.

As to Officer Bond's use of the baton, the techniques he employed - including striking Micah on the shoulder and using the baton as a pry - are both RPD and P.O.S.T. approved. Officer Bond only escalated to this use of force when Micah was able to pull his handcuffed right hand back under his body. The court finds that Officer Bond's limited use of the baton on Micah was objectively reasonable because Micah was actively, and aggressively resisting arrest. Similarly, the court finds that Officer Bond's escalation to the use of the Taser was also objectively reasonable. Micah's prolonged resistance and success at gaining a weapon by taking Officer Bond's baton justified his use of his taser in both barb and drive stun mode. *See e.g., Marquez v. City of Phoenix*, 693 F.3d 1167 (9th Cir. 2012) (holding that officers did not use excessive force when they tased the individual 22 times in a short period where the individual was actively resisting arrest and the officers could have believed that their safety and the safety of others was at risk due to the individual's persistent and violent resistance and behavior).

Finally, the court notes that the Washoe County Sheriff's Department performed an independent investigation into Micah's death and determined that defendants' use of force was reasonable given the totality of the circumstances and did not violate any applicable law or standard. *See* Doc. #71, Exhibit 1. Specifically, the investigation determined that the officers' use of force was reasonable under *Graham* because Micah had committed assault and battery, tried to

///

evade arrest, and actively resisted arrest. Based on the totality of circumstances in this action, the court agrees. Therefore, the court shall grant moving defendants' motion for summary judgment.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment based on qualified immunity (Doc. #71) is GRANTED. The clerk of court shall enter judgment in favor of defendants the City of Reno, Reno Police Department, Officer Keith Pleich, Officer Daniel Bond, and Officer Scott Rasmussen, and against plaintiff Denise Abbey.

IT IS FURTHER ORDERED that plaintiff's cross-motion for summary judgment (Doc. #72) is DENIED.

IT IS SO ORDERED.

DATED this 30th day of March, 2015.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE